State of Maryland v. Christopher Mann, No. 29, September Term, 2019

**INEFFECTIVE ASSISTANCE OF COUNSEL – PREJUDICE PRONG – PURPORTED ALIBI WITNESSES** – Court of Appeals held that petitioner for postconviction relief failed to establish that his trial counsel rendered ineffective assistance of counsel by not requesting alibi jury instruction, as petitioner had failed to satisfy prejudice prong of test set forth in Strickland v. Washington, 466 U.S. 668 (1984), *i.e.*, burden to prove that there was reasonable probability, or substantial or significant possibility, that jury would have acquitted him if his trial counsel had requested alibi jury instruction and trial court had given instruction. Circumstance that petitioner's trial counsel did not request alibi jury instruction did not prejudice petitioner because, upon closer inspection, none of four purported alibi witnesses' testimony led to conclusion that petitioner could not have been at murder scene when victim was killed, and trial court's giving of instructions on State's burden to prove guilt beyond a reasonable doubt undercut claim of prejudice.

IN THE COURT OF APPEALS

OF MARYLAND

No. 29

September Term, 2019

_____

STATE OF MARYLAND

v.

CHRISTOPHER MANN

_____

Barbera, C.J.
McDonald
Watts
Hotten
Booth
Harrell, Glenn T., Jr. (Senior
Judge, Specially Assigned)
Greene, Clayton, Jr. (Senior
Judge, Specially Assigned),

JJ.

_____

Opinion by Watts, J.
Barbera, C.J., and Hotten, J., dissent.

_____

Filed: December 19, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

An alibi is "[a] defense [that is] based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time." *Alibi*, Black's Law Dictionary (11th ed. 2019). An alibi is not an affirmative defense—that is, a defense that "[t]he defendant bears the burden of proving[.]" *Affirmative Defense*, Black's Law Dictionary. "An alibi is not an affirmative defense" because it "simply negates an element of the crime"—namely, the allegation that the defendant was the one who committed the crime, which the State has the burden of proving beyond a reasonable doubt. Harris v. State, 458 Md. 370, 411 n.31, 182 A.3d 821, 845 n.31 (2018) (citations omitted).

> Maryland Criminal Pattern Jury Instruction 5:00, addressing alibis, provides:
>
> You have heard evidence that the defendant was not present when the crime was committed. You should consider this evidence along with all other evidence in this case. In order to convict the defendant, the State must prove, beyond a reasonable doubt, that the crime was committed and the defendant committed it.

Although Maryland Criminal Pattern Jury Instruction 5:00 is known as an "alibi jury instruction," it does not use the word "alibi" because doing so could "incorrectly suggest that alibi is an affirmative defense." MPJI-Cr 5:00 cmt. Where an alibi jury instruction is applicable under a case's facts, on request, a trial court must give an alibi jury instruction. See Smith v. State, 302 Md. 175, 180-81, 486 A.2d 196, 198-99 (1985).

This case requires us to determine whether a petitioner for postconviction relief has satisfied, under Strickland v. Washington, 466 U.S. 668 (1984), the burden of proving that he was prejudiced by his trial counsel not requesting, and the trial court not giving, an alibi jury instruction where purported alibi witnesses testified at trial.

In the Circuit Court for Baltimore City, the State, Petitioner, charged Christopher "Crack" Mann, Respondent, with first-degree felony murder, kidnapping, conspiracy to kidnap, and other crimes. At trial, the State offered evidence of the following events. On April 22, 2003, sometime between 6:43 p.m. and 7:03 p.m., Mann and two of his friends, Tayvon "Tay" Whetstone and Kenneth "Kane" / "Kenny" Fleet,[1] confronted the victim, Ricky "Little Rick" Prince, at a McDonald's on Liberty Road near its intersection with Rolling Road, about him having been a witness for the State in a criminal case. Fleet got into Prince's vehicle and drove away. Whetstone told Prince that he would take Prince to his vehicle. Mann, Whetstone, and Prince got into a vehicle. Ultimately, Whetstone drove to the area behind a nightclub called "Fantasies," which is in the Curtis Bay neighborhood of Baltimore City. There, in Mann's presence, sometime during the evening of April 22, 2003, Whetstone shot Prince.

Mann's trial counsel called four alleged alibi witnesses, who purported to account for Mann's whereabouts from approximately 7:30 p.m. or 7:45 p.m. on April 22, 2003 to the morning of April 23, 2003. Mann's trial counsel did not request, and the circuit court did not give, an alibi jury instruction.

After being convicted and pursuing an unsuccessful direct appeal, Mann petitioned for postconviction relief, contending that his trial counsel provided ineffective assistance of counsel by not requesting an alibi jury instruction. The circuit court agreed and ordered

---

[1]Mann and Whetstone were charged with first-degree felony murder and were tried separately. Fleet was charged with, and pled guilty to, carjacking. Neither Mann, Whetstone, nor Fleet testified in this case.

a new trial.  The State successfully applied for leave to appeal, and the Court of Special Appeals affirmed.  The State filed a petition for a writ of *certiorari*, which this Court granted.

Before us, the State contends that an alibi jury instruction would not have significantly affected the jury's deliberations.  Mann responds that it is reasonably possible that, in the absence of an alibi jury instruction, the jury believed that he had the burden to prove an alibi or did not consider the purported alibi witnesses' testimony at all.  We hold that Mann has failed to satisfy the burden to prove that there is a reasonable probability, or a substantial or significant possibility, that the jury would have acquitted him if his trial counsel had requested an alibi jury instruction and the circuit court had given the instruction.  The circumstance that Mann's trial counsel did not request an alibi jury instruction did not prejudice Mann because, upon closer inspection, none of the four purported alibi witnesses' testimony indicated that Mann could not have been at the murder scene when Whetstone shot Prince, and the circuit court's giving of other instructions regarding the State's burden to prove guilt beyond a reasonable doubt diminishes the claim of prejudice.

## BACKGROUND

### Trial and Direct Appeal

At trial, as a witness for the State, Detective Kevin Klimko of the Baltimore County Police Department testified that, on April 15, 2003, Jerrard "Tick" Bazemore pled guilty to the murder of Charles Edward Sharp.  During Mr. Bazemore's guilty plea hearing, the prosecutor in that matter proffered that, had there been a trial, Prince—the murder victim

- 3 -

in this case—would have testified that he provided Bazemore with the gun that was used to fatally shoot Sharp. After Bazemore said that he was pleading guilty, two individuals in the gallery "stood up and said[:] 'You don't have to go down like that, man,' and pretty much objected to the fact that he was pleading guilty." The two individuals then left the courtroom. Detective Klimko testified that he would not recognize the two individuals if he saw them again.

As a witness for the State, Detective Gerald D'Angelo of the Baltimore County Police Department testified that, on April 23, 2003, he interviewed Mann, who said that, on the evening of April 22, 2003, he went to the McDonald's to get something to eat and saw Prince there. Mann said that he and Prince calmly talked about Prince having been a witness against Bazemore, and that, while they were talking, someone got into Prince's vehicle and drove away. Detective D'Angelo responded that he did not believe that Mann had told the truth. Detective D'Angelo also said that he knew that Mann had gone to the McDonald's with two other individuals, and that his conversation with Prince had been heated. During the interview, Mann acknowledged that he had not told the truth. Mann said that he had been driving a Ford Escort that belonged to his girlfriend, Tanea Jenkins, and needed to return it to her before her shift at a Target[2] ended. Mann said that two of his friends, Whetstone and Fleet, gave him a ride from the Target to the McDonald's in a black 1991 Chevrolet Caprice that belonged to Whetstone's girlfriend. Mann acknowledged that he had gotten into a heated argument with Prince about Prince having been, as Mann put

_____

[2]Multiple witnesses' testimony indicated that the Target in question is on Reisterstown Road.

it, a "snitch" against Bazemore. Mann said that Fleet got into Prince's vehicle, a Toyota Corolla, and drove away, and that he told Prince that that he would get Prince's vehicle back for him. Mann said that he and Whetstone went to Mann's father's house,[3] and then returned to the McDonald's.

While testifying, Detective D'Angelo read aloud a statement that Mann had handwritten and signed. In his written statement, Mann alleged the following events, which we summarize. On April 22, 2003, at 11 a.m. or 11:30 a.m., Mann drove Jenkins to the Target. Afterward, Mann visited one of his friends, Jeffrey Johnson, at his house.[4] At approximately 1:45 p.m. or 2 p.m., Mann left Johnson's house. At approximately 4:30 p.m. or 5 p.m., Mann went to his mother's house.[5] Mann met with Whetstone and Fleet, who followed him to the Target. At approximately 6:30 p.m. or 6:45 p.m., Mann dropped Jenkins's vehicle off at the Target. Jenkins gave Mann six dollars, and he, Whetstone, and Fleet left the Target. At approximately 7 p.m., Mann, Whetstone, and Fleet arrived at the McDonald's. There, Mann talked to Prince about Bazemore. While Mann was talking to Prince, Fleet got into Prince's vehicle and drove away. Mann and Whetstone went to Mann's father's house, where they stayed for at least five to ten minutes. Afterward, Mann and Whetstone went to Johnson's house. After that, Mann and Johnson's girlfriend went

---

[3]Detective D'Angelo testified that Mann's father lived at 3411 Kimble Road. Another law enforcement officer testified that Mann's father's house was approximately two blocks from the McDonald's.
[4]Johnson testified that he lived approximately a mile-and-a-half from the McDonald's.
[5]Detective D'Angelo testified that Mann's mother lived at 1516 Lester Morton Court, in east Baltimore City.

to Mann's mother's house. Mann requested a ride from Jenkins, who picked him up, dropped one of her friends off, and drove to Mann's father's house, where they spent the night.

As a witness for the State, Detective Raymond Laslett of the Baltimore City Police Department testified that he recovered a recording that was made on April 22, 2003 by at least one surveillance camera at the Target where Jenkins worked. The recording was played during Detective Laslett's direct-examination, and he testified that it showed the following events, which we summarize. In the Target's parking lot, a black Ford Escort followed a black Chevrolet Caprice. Afterward, Mann, Whetstone, and Fleet appeared together. Then, Mann and Jenkins appeared together. At 6:43 p.m., the Caprice left the Target's parking lot. According to Detective Laslett, the Escort that appeared in the recording belonged to Jenkins, and the Caprice that appeared in the recording belonged to Whetstone's girlfriend.

As a witness for the State, Jackie Davis, Prince's mother, testified that, on the evening of April 22, 2003, Prince borrowed her burgundy Toyota Corolla so that he could pick up his paycheck from a Checkers. At approximately 6:45 p.m., while Davis was at her house, Prince telephoned her, sounding "anxious and talking fast[.]" According to Davis, Prince said that someone had "approached him and said that he had snitched" against Bazemore, and that someone had taken the Corolla. Prince also said that "one individual out there was" Mann. After hanging up, Davis telephoned 911 and reported the Corolla's theft. Two law enforcement officers arrived at Davis's house and took her to a gas station on Liberty Road. Along the way, Davis and the officers passed by the

McDonald's. Davis, who was looking for Prince, did not see him in the area of the McDonald's.

As a witness for the State, Officer Morris Gardner of the Baltimore County Police Department testified that, on April 22, 2003, at 7:03 p.m., he heard about a report of a theft of a burgundy Toyota Corolla in the area of the McDonald's. Officer Gardner drove to the area, saw a burgundy Toyota Corolla, contacted his supervisor, and confirmed that the license plate was that of the stolen Corolla. The Corolla pulled into a gas station, and the driver, Fleet, exited the Corolla. Officer Gardner parked his vehicle and arrested Fleet. Davis was brought to the gas station and said that she did not recognize Fleet.

As a witness for the State, Derrick Harper ("Mr. Harper")[6] testified that he had known Prince, Mann, Whetstone, and Fleet. On April 25, 2003, Whetstone asked Mr. Harper to move the Caprice (*i.e.*, Whetstone's girlfriend's vehicle) because Whetstone did not want it to get towed and did not have a driver's license. That was the first occasion on which Mr. Harper had seen the Caprice. Mr. Harper started driving the Caprice, and officers initiated a traffic stop and arrested Mr. Harper.

From the night of April 25, 2003 to the morning of April 26, 2003, officers questioned Mr. Harper, who handwrote certain answers on a document. The circuit court admitted the document into evidence, and the prosecutor read certain excerpts of it aloud while direct-examining Mr. Harper. The document indicated that Mr. Harper wrote that Mann had alleged the following events, which we summarize. When Mann was with

---

[6]Derrick Harper was a witness for the State, and Rhonda Harper was a witness for Mann. As far as the record reveals, Mr. Harper and Ms. Harper are unrelated.

Whetstone and Fleet at the McDonald's, they encountered Prince. Fleet punched Prince twice, Mann kicked Prince, and Fleet got into Prince's vehicle and drove away. Whetstone was afraid that he would get implicated in Fleet's theft of Prince's vehicle. Mann wanted to scare Prince into not telling anyone about Fleet's theft of Prince's vehicle. Whetstone told Prince that he would take Prince to his vehicle. Mann, Whetstone, and Prince got into Whetstone's vehicle, which was in the area of the McDonald's, and Whetstone drove away. While Whetstone was driving, Mann tried to persuade Prince not to tell anyone about Fleet's theft of Prince's vehicle, and Prince promised not to do so. Mann was satisfied with Prince's promise, but Whetstone was not. Whetstone shot Prince in the head.

During Mr. Harper's cross-examination, Mann's trial counsel asked: "If you don't take the beltway[,] and you go from [the] McDonald's on Liberty Road to the 5[5]00 block of Pennington Avenue,[7] it would take about an hour, would it not?" Mr. Harper responded: "Around. I mean, that's past Cherry Hill, Patapsco[ Avenue], and all that."

As a witness for the State, Officer Mark William Rejrat of the Baltimore City Police Department testified that, on April 23, 2003, at approximately 4 p.m., he went to the area behind a nightclub called "Fantasies," which is at 5520 Pennington Avenue in the Curtis Bay neighborhood of Baltimore City. Officer Rejrat explained that the area behind Fantasies is a former "city dump" that is "commonly known as . . . 'bloody pond.'" In a ditch near the pond, Officer Rejrat found a deceased man's body. A detective found a driver's license with Prince's name inside a wallet on the deceased man's person.

---

[7]Prince's body was found near 5520 Pennington Avenue. While cross-examining Mr. Harper, Mann's trial counsel inadvertently referred to 5200 Pennington Avenue.

As a witness for the State, Jack Titus, M.D., the Deputy Chief Medical Examiner, was admitted as an expert in forensic pathology and postmortem examination. Dr. Titus testified that, on April 24, 2003, he autopsied Prince's body. Prince had a gunshot entry wound on the back of the right side of his head, and a gunshot exit wound on the left side of his forehead. Dr. Titus opined that the cause of death was a gunshot wound to the head, and the manner of death was homicide. Dr. Titus estimated that the time of death was the evening of April 22, 2003, "roughly." Dr. Titus cautioned that he could make only a "[r]eal general approximation" as to the time of death because there were "just too many variables to say an exact hour."

As a witness for Mann, Johnson testified that, on April 22, 2003, sometime between 12 p.m. and 2 p.m., Mann arrived at Johnson's house. For approximately fifteen minutes, Mann and Johnson talked; afterward, Mann left. At approximately 7:30 p.m. or 7:45 p.m., Mann returned to Johnson's house and said that Whetstone had just dropped him off. For approximately forty-five minutes, Mann and Johnson played a video game. At approximately 8:30 p.m., Mann and Johnson left Johnson's house. At approximately 8:45 p.m., Mann and Johnson arrived at Mann's mother's house. Shortly afterward, Johnson left.

As a witness for Mann, Jenkins, his girlfriend, testified that, on April 22, 2003, she worked at the Target from 11 a.m. to 7 p.m. At approximately 6:43 p.m. or 6:44 p.m., Mann, Whetstone, and Fleet came to see Jenkins. Mann gave Jenkins the key to her vehicle. Shortly afterward, Mann left. After leaving the Target, Jenkins went to her house, then picked up one of her friends, Nikita Peay. Afterward, Jenkins and Peay "just drove

around." At approximately 9 p.m., Mann telephoned Jenkins and asked her to pick him up from his mother's house. At approximately 9:30 p.m., Jenkins arrived at Mann's mother's house. For approximately two hours, Mann, Jenkins, and Peay "just drove around[.]" Afterward, Jenkins dropped Peay off and drove herself and Mann to his father's house, where they spent the night.

As a witness for Mann, Peay testified that, on April 22, 2003, at 8 p.m., Jenkins picked her up. Peay and Jenkins "drove around for a while[.]" Mann telephoned Jenkins and asked her to pick him up. At 9:30 p.m., Jenkins picked Mann up. Afterward, Mann, Jenkins, and Peay "drove around." At 11:15 p.m., Jenkins dropped Peay off at her house.

As a witness for Mann, Rhonda Harper ("Ms. Harper"), Mann's cousin, testified that she lived with his father. On April 22, 2003, sometime after 7 p.m., Ms. Harper left Mann's father's house to give a friend a ride. At approximately 11:30 p.m. or 11:45 p.m., Ms. Harper returned to Mann's father's house, and saw Mann and Jenkins sitting outside.

During the State's initial closing argument, the prosecutor addressed the purported alibi witnesses, in pertinent part, as follows:

> Johnson [is] the one [whom] you should actually look for -- look at [] most closely, because this murder[ --] we know that [Prince] was taken right away from [the] McDonald's, because we know that[,] when [Davis] gets there[,] [Prince is] not there. Neither is [] Mann.
> Who had the motive and the opportunity? [Mann] and [] Whetstone. Who else was there at the time? And[,] ladies and gentlemen, this murder happened as soon as it -- as long as it takes to get from [the] McDonald's to Curtis Bay; in that time period. So[,] did [] Jenkins pick up [Mann] at 9:30[ p.m.]? Maybe. And ride around with [Peay] in the [Escort]? Sure. Maybe. After the murder. Did [Ms.] Harper see [] Jenkins and [Mann] at [his father's] house that night? Sure. Maybe. Was [Mann] with [] Johnson at his house? I submit to you, no.

During Mann's closing argument, his trial counsel addressed Mr. Harper's and Johnson's testimony, in pertinent part, as follows:

> [Mr.] Harper[] was arrested with the [] Caprice [] in [Baltimore C]ity. And he tells the police . . . that there's a problem with the hood latch[,] and he can't take it on the highway. . . . . To go from [the] McDonald's on Liberty Road and Rolling Road to Curtis Bay, [twenty] miles on the [b]eltway[,] will take you probably a half[-]hour. If you have to go to the side streets[,] it will take you probably an hour to an hour[-]and[-]a[-]half. Why is that important? Because the time doesn't fit. . . . [Mann] was at [] Johnson's house.

During the State's rebuttal closing argument, the prosecutor alleged the following events, which we summarize. At 6:43 p.m., Mann, Whetstone, and Fleet left the Target. Afterward, Mann, Whetstone, and Fleet arrived at the McDonald's and encountered Prince. Mann, Whetstone, and Prince got into a vehicle, and it took an hour to drive through Baltimore City and reach Curtis Bay. At approximately 8 p.m., Prince was killed. Afterward, Whetstone drove Mann to Whetstone's house,[8] and Mann walked a short distance to his mother's house. At 9 p.m., Mann telephoned Jenkins and asked her to pick him up from his mother's house.

Mann's trial counsel did not request, and the circuit court did not give, an alibi jury instruction. While preliminarily instructing the jury at the start of the trial, the circuit court stated in pertinent part: "[T]he defendant may or may not call witnesses. The defendant has no obligation to call witnesses. The State has the burden of proving the defendant's guilt beyond a reasonable doubt. The defendant does not have to prove innocence." While instructing the jury at the conclusion of the trial, the circuit court stated in pertinent part:

---

[8]Mr. Harper testified that Whetstone lived on Lester Morton Court, "around the Caroline and Monument area[,]" in Baltimore City.

"The State has the burden of proving the guilt of the Defendant beyond reasonable doubt. The burden remains on the State throughout the trial. The Defendant is not required to prove his innocence." After instructing the jury at the conclusion of the trial, the circuit court initiated a bench conference and asked counsel: "Is there anything [that] you want me to add or subtract?" Mann's trial counsel responded: "No exceptions."

The jury found Mann guilty of first-degree felony murder, kidnapping, and conspiracy to kidnap. Mann appealed, and the Court of Special Appeals affirmed.

**Petition for Postconviction Relief**

On June 9, 2014, almost ten full years after his conviction, in the circuit court, while representing himself, Mann filed a petition for postconviction relief. On October 6, 2015, on Mann's behalf, his postconviction counsel filed a supplemental petition for postconviction relief. Both the petition and supplemental petition included the contention that Mann's trial counsel rendered ineffective assistance of counsel by not requesting an alibi jury instruction. On September 27, 2017, the circuit court conducted a hearing on the petitions.

At the hearing, as a witness for Mann, his trial counsel testified that, at trial, on Mann's behalf, he pursued an alibi defense. Mann's postconviction counsel asked: "If you [did not] request an alibi [jury] instruction, is that something that you would have had reason for not requesting?" Mann's trial counsel responded: "No. I mean, the defense was alibi." Mann's postconviction counsel asked: "It would have been your expectation that there would have been an alibi [jury] instruction in this case?" Mann's trial counsel responded: "Irrespective of whether or not it was requested, yes. Because that was the

defense."

At the conclusion of the hearing, the circuit court took the petition under advisement. On February 12, 2018, the circuit court issued a Statement of Reasons and Order of Court in which it granted the supplemental petition in part, granted Mann's request for a new trial, and denied his requests for other forms of postconviction relief. The circuit court granted postconviction relief on the ground that Mann's trial counsel rendered ineffective assistance of counsel by not requesting an alibi jury instruction, and denied postconviction relief on all other grounds. Addressing the performance prong, the circuit court stated:

> [F]our defense witnesses[—*i.e.*, Johnson, Jenkins, Peay, and Ms. Harper—]and [Mann]'s [] statement[s to Detective D'Angelo] supported an alibi jury instruction[,] and [Mann's] trial counsel was objectively deficient in [not] request[ing an alibi jury] instruction[, which] fully encapsulated [Mann]'s theory of the case. . . . [I]t cannot be said that [Mann's trial] counsel's actions were [the] result of any [] trial strategy, and [Mann's trial counsel] testified as [m]uch. . . . [Mann's] trial counsel's omission . . . could not have been a result of reasonable professional judgment[.]

(Citation omitted). Addressing the prejudice prong, the circuit court reasoned:

> Without the [alibi jury] instruction, . . . it is reasonably possible that the jury might have placed the burden of proof on the defense with respect to "proving" the alibi. . . . Alternatively, it is reasonably probable that the jury may not have considered, as they were not instructed to, the defense theory of the case at all. . . . [T]rial courts commit reversible error [in] failing to give an alibi jury instruction when there is evidence [] to support it. . . . [I]t follows that . . . it [was] prejudicial to [Mann] when [his] trial counsel [did not] request a[ jury] instruction that epitomize[d] the only theory of the defense.

(Cleaned up). Addressing both the performance prong and the prejudice prong, the circuit court concluded:

> Based on the number of alibi witnesses, the substance of their

testimony, [Mann's] trial counsel's [] testimony that he did not have a strategic reason for not requesting an alibi [jury] instruction, and the State's lack of direct and circumstantial evidence linking [Mann] to [Prince's murder], . . . [Mann's] trial counsel was deficient in [not] request[ing an alibi jury instruction], and there is a reasonable probability that the omission influenced the verdict[s.]

(Footnote omitted).

## Opinion of the Court of Special Appeals

The State filed an application for leave to appeal, which the Court of Special Appeals granted. On May 1, 2019, the Court of Special Appeals affirmed the circuit court's judgment, stating: "Given the heightened sensitivity [that has been] expressed by Maryland courts concerning the importance of [an] alibi [jury] instruction, we hold that the failure (*not the disinclination but the failure*[]) of [Mann's] trial counsel to request the [alibi jury] instruction in this case constituted ineffective assistance of counsel." State v. Mann, 240 Md. App. 592, 606, 207 A.3d 653, 661 (2019) (emphasis in original).

Addressing the performance prong, the Court of Special Appeals determined that Mann's trial counsel not requesting an "alibi jury instruction fell below the 'broad range of reasonable professional judgment' standard . . . and therefore constituted deficient performance." Id. at 602, 207 A.3d at 658-59 (citation omitted). The Court of Special Appeals stated that "there [was] no question [] that Mann generated an alibi[.]" Id. at 600, 207 A.3d at 658. The Court of Special Appeals observed that the State conceded that Mann's trial counsel did not request an alibi jury instruction because of an oversight, as opposed to strategy. See id. at 601, 207 A.3d at 658. The Court of Special Appeals reasoned that "the record here is devoid of any strategic reason for not requesting an alibi

- 14 -

[jury] instruction[,]" and that Mann's trial counsel not requesting an alibi jury instruction was not because of a "'disinclination' to request [an] alibi [jury] instruction[.]" Id. at 601, 207 A.3d at 658 (citation omitted).

Addressing the prejudice prong, the Court of Special Appeals concluded that "Mann was prejudiced because he did not receive the benefit of [an] alibi [jury] instruction as a result of his [trial] counsel[ not] request[ing] it." Id. at 606, 207 A.3d at 661. The Court of Special Appeals reasoned:

> [T]here exists a strong concern that a jury will assume that a criminal defendant bears some burden of proof by introducing alibi evidence, even if the word "alibi" is never uttered in the courtroom. . . . By providing an alibi [jury] instruction, [a] trial court sufficiently relieves these concerns. Here, where an alibi [jury] instruction was not given because [Mann's] trial counsel [did not] request it, there is a substantial or significant possibility that the verdict[s were] affected.

Id. at 605-06, 207 A.3d at 661 (cleaned up).

## Petition for a Writ of *Certiorari*

On May 29, 2019, the State petitioned for a writ of *certiorari*, raising the following issue: "Did the Court of Special Appeals err when it held that [Mann's trial] counsel[ not] request[ing] an alibi jury instruction was prejudicial . . . when the presence of [an alibi jury] instruction would not have presented a likelihood of a different outcome of the trial?" On July 12, 2019, this Court granted the petition. See State v. Mann, 464 Md. 588, 212 A.3d 396 (2019).

## DISCUSSION

### The Parties' Contentions

The State contends that an alibi jury instruction would not have significantly

affected the jury's verdict, as it would have simply reminded the jury that it had heard testimony that Mann was not at the murder scene, that the jury should consider that testimony along with the rest of the evidence, and that the jury should not find Mann guilty unless the State proved guilt beyond a reasonable doubt. The State asserts that, contrary to the circuit court's reasoning, Mann's trial counsel pursued multiple defenses in addition to an alibi—specifically, Mann's trial counsel indicated that the forensic work was insufficient; that Prince could have been murdered in a robbery gone wrong; that Mr. Harper could have murdered Prince; and that people other than Mann had a motive to murder Prince for being a witness against Bazemore.

Mann responds that he was prejudiced by his trial counsel not requesting an alibi jury instruction. Mann contends that, if his trial counsel had requested an alibi jury instruction, the circuit court almost certainly would have given it, and, if not, the circuit court not giving an alibi jury instruction would have been reversible error. Mann argues that it is reasonably possible that, in the absence of an alibi jury instruction, the jury believed that he had the burden to prove the alibi or did not consider the testimony of the purported alibi witnesses at all.

**Standard of Review**

In reviewing a trial court's ruling on a petition for postconviction relief, an appellate court reviews for clear error the trial court's findings of fact, and reviews without deference the trial court's conclusions of law, including a conclusion as to whether the petitioner received ineffective assistance of counsel. See Newton v. State, 455 Md. 341, 351-52, 168 A.3d 1, 7 (2017), cert. denied, ___ U.S. ___, 138 S. Ct. 665 (2018).

- 16 -

**Ineffective Assistance of Counsel Generally**

In Strickland, 466 U.S. at 687, the Supreme Court set forth a two-prong test for resolving a claim of ineffective assistance of counsel. "The first prong is known as 'the performance prong,' and the second prong is known as 'the prejudice prong.'" Ramirez v. State, 464 Md. 532, 560, 212 A.3d 363, 380 (2019) (cleaned up). "Generally, where a petitioner alleges ineffective assistance of counsel, the burden rests on him or her to satisfy both the performance prong and the prejudice prong." Id. at 562, 212 A.3d at 381 (cleaned up).

To satisfy the prejudice prong, a petitioner "must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, [*i.e.*,] a trial whose result is reliable." Strickland, 466 U.S. at 687. More specifically, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability [that is] sufficient to undermine confidence in the outcome." Id. at 694. In State v. Syed, 463 Md. 60, 86-87, 204 A.3d 139, 154 (2019), cert. denied, No. 19-227, ___ S. Ct. ___ (Nov. 25, 2019), this Court stated: "We have interpreted [']reasonable probability['] to mean 'there was a substantial or significant possibility that the verdict . . . would have been affected.'" (Quoting Bowers v. State, 320 Md. 416, 426, 578 A.2d 734, 739 (1990)) (emphasis omitted). In Strickland, 466 U.S. at 695-96, the Supreme Court explained how to assess prejudice as follows:

[A] court [that is] hearing an ineffectiveness claim must consider the totality

- 17 -

of the evidence [that was] before the . . . jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences [that were] to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict [that is] only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court [that is] making the prejudice inquiry must ask [whether] the [petitioner] has met the burden of showing that the decision [that was] reached would reasonably likely have been different absent the errors.

In Syed, 463 Md. at 104-05, 204 A.3d at 165, this Court held that, although a petitioner's trial counsel's performance was deficient for not investigating an alibi witness, trial counsel's deficient performance did not prejudice the petitioner. In that case, the petitioner, who was a high school student at the time of the crime, was convicted of murdering a fellow student, his former girlfriend who had recently broken off the relationship and begun dating another person. See id. at 89, 67, 204 A.3d at 156, 143. On the date of the murder, at 2:15 p.m., the school day ended. See id. at 92, 204 A.3d at 157. A witness for the State testified that, on that date, while he and the petitioner were in a parking lot, the petitioner showed him the victim's body. See id. at 89, 204 A.3d at 155-56. The State's witness testified that, later on that date, at approximately 7 p.m., he saw the petitioner bury the victim's body at a certain park, where her body was ultimately found. See id. at 88, 204 A.3d at 155. Consistently, the State offered evidence that, at 7:09 p.m. and 7:16 p.m., the petitioner's cell phone received calls while it was in the area of the park. See id. at 88, 204 A.3d at 155.

After being convicted and pursuing an unsuccessful direct appeal, the petitioner

petitioned for postconviction relief. See id. at 68, 204 A.3d at 143. The petitioner contended that, among other things, his trial counsel was ineffective in not investigating a certain alibi witness or calling her at trial. See id. at 68-69, 204 A.3d at 144. In an affidavit, the alibi witness averred that, on the date of the murder, from 2:30 p.m. to 2:40 p.m., she was with the petitioner at a public library. See id. at 91, 204 A.3d at 157. A trial court vacated the petitioner's convictions and ordered a new trial, concluding that, although the petitioner's trial counsel's conduct in not investigating the alibi witness or calling her at trial did not constitute ineffective assistance of counsel, the petitioner's trial counsel had rendered ineffective assistance of counsel with regard to another matter. See id. at 70, 204 A.3d at 144-45. The Court of Special Appeals affirmed the order for a new trial, reasoning that, although the petitioner waived his contention that his trial counsel provided ineffective assistance of counsel with regard to the other matter, the petitioner's trial counsel rendered ineffective assistance of counsel in not investigating the alibi witness or calling her at trial. See id. at 70-72, 204 A.3d at 145-46.

This Court reversed the Court of Special Appeals's judgment with instruction to reverse the trial court's order for a new trial. See id. at 105, 204 A.3d at 165. This Court concluded that, although the petitioner's counsel was deficient in not investigating the alibi witness, the lack of investigation did not prejudice the petitioner. See id. at 104-05, 204 A.3d at 165. Addressing the prejudice prong, this Court determined that, even if the alibi witness was truthful in stating that, from 2:30 p.m. to 2:40 p.m., she was with the petitioner at a public library, that circumstance did "little more than to call into question the time that the State claimed [that the victim] was killed[,] and [did] nothing to rebut the evidence

establishing [the petitioner]'s motive and opportunity to kill" the victim. Id. at 91, 204 A.3d at 157. This Court explained that, in other words, even if the petitioner's trial counsel had called the alibi witness at trial, and even if the jury had found her credible, "the jury could have disbelieved that [the petitioner] killed [the victim] by 2:36 p.m., as the State's timeline suggested, yet still believed that [the petitioner] had the opportunity to kill [the victim] after 2:40 p.m." Id. at 91-92, 204 A.3d at 157. This Court noted that the alibi witness's testimony could not have led to an acquittal because it would not have negated the petitioner's guilt, given that the alibi witness did not account for the petitioner's whereabouts after 2:40 p.m. See id. at 92, 204 A.3d at 157.

### Alibi Jury Instructions Generally

Maryland Rule 4-325(c) states in pertinent part:

[A trial] court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. . . . The [trial] court need not grant a request[ for a jury] instruction if the matter is fairly covered by [the jury] instructions [that are] actually given.

This Court has explained that Maryland Rule 4-325(c)

requires [a] trial court to give a requested [jury] instruction under the following circumstances: (1) the requested [jury] instruction is a correct statement of the law; (2) the requested [jury] instruction is applicable under the facts of the case; and (3) the content of the requested [jury] instruction was not fairly covered [by] the jury instruction[s that were] actually given.

McMillan v. State, 428 Md. 333, 354, 51 A.3d 623, 635 (2012) (cleaned up).

In Pulley v. State, 38 Md. App. 682, 690-91, 382 A.2d 621, 626 (1978), the Court of Special Appeals held that a trial court erred in denying a defendant's request for an alibi jury instruction. In that case, the defendant, his cousin, and his cousin's wife testified that,

on the date of the crime, the defendant spent the evening at his cousin's and his cousin's wife's house. See id. at 686, 382 A.2d at 624. The trial court instructed the jury regarding the presumption of innocence and the burden of proof. See id. at 690, 382 A.2d at 626.

The defendant was convicted, and the Court of Special Appeals reversed and remanded for a new trial. See id. at 684, 382 A.2d at 622. The Court of Special Appeals concluded that the trial court should have granted the defendant's request to give an alibi jury instruction because the defense witnesses' testimony, "if believed, would have been sufficient to establish an alibi for the entire period during which the sequence of events [that was] related by the State's witness[] unfolded." Id. at 688, 382 A.2d at 625. The Court of Special Appeals rejected "the State's contention . . . that the requested alibi [jury] instruction was 'fairly covered' by the [jury] instructions with respect to the presumption of innocence and the burden of proving the [defendant] guilty beyond a reasonable doubt." Id. at 690, 382 A.2d at 626.

In Smith, 302 Md. at 177, 486 A.2d at 196, this Court held that a trial court erred in denying a defendant's request for an alibi jury instruction. In that case, the defendant testified that he was in Texas when the crimes were being committed in Maryland. See id. at 177, 486 A.2d at 196. The defendant was convicted, and the Court of Special Appeals affirmed, reasoning that, "for a defendant to be entitled to an alibi [jury] instruction, his [or her] alibi testimony must be corroborated." Id. at 178, 486 A.2d at 197.

This Court reversed and remanded for a new trial. See id. at 183-84, 486 A.2d at 200. This Court concluded that a "defendant's uncorroborated testimony[] that he [or she] was at some other place at the time of the crime[] is sufficient to generate" an alibi jury

instruction.  Id. at 180-81, 486 A.2d at 198-99.  This Court "agree[d] with the holding of the Court of Special Appeals in" Pulley, 38 Md. App. at 690, 382 A.2d at 626, that,

> when the evidence in a criminal case generates the issue of alibi, and when the defendant requests an instruction specifically addressed to the matter of alibi, the defendant is entitled to a[n] alibi [jury] instruction, and [] the [jury] instructions concerning the [] burden of proof, etc., are not deemed to "fairly cover" the matter of alibi.

Smith, 302 Md. at 180, 486 A.2d at 198 (citations omitted).

In Robertson v. State, 112 Md. App. 366, 370, 685 A.2d 805, 807 (1996), the Court of Special Appeals held that a trial court erred in denying a defendant's request for an alibi jury instruction.  In that case, the defendant "premised his alibi [] on a [State's] witness who testified as to exculpatory statements" that the defendant made to him.  Id. at 378, 685 A.2d at 811.  The defendant was convicted, and the Court of Special Appeals reversed and remanded for a new trial.  See id. at 388, 685 A.2d at 816.  The Court of Special Appeals observed that Robertson was "readily distinguishable from" Pulley, 38 Md. App. 682, 382 A.2d 621, and Smith, 302 Md. 175, 486 A.2d 196, because, in Robertson, the defendant "did not offer any evidence of alibi[,] either in the form of an alibi witness or with his own testimony."  Robertson, 112 Md. App. at 378, 685 A.2d at 811.  The Court of Special Appeals, however, determined that, on request, a trial "court must give [an] alibi [jury] instruction . . . where there is some evidence . . . to support the position that the defendant was elsewhere when the crime occurred. . . . [T]he defendant, him[- or her]self, need not introduce alibi evidence . . . to generate . . . an [alibi jury] instruction[.]"  Id. at 381-82, 685 A.2d at 813.  The Court of Special Appeals explained that, in Robertson, the defendant was entitled to an alibi jury instruction on request because "there was some evidence . . . from

- 22 -

which a jury could have inferred that [the defendant] was not at the murder scene at" the time of the crime.  Id. at 385, 685 A.2d at 814.

**Ineffective Assistance of Counsel and Alibi Jury Instructions**

In State v. Matthews, 58 Md. App. 243, 248, 472 A.2d 1044, 1046 (1984), the Court of Special Appeals held that a petitioner's trial counsel did not render ineffective assistance of counsel by not pursuing an alibi or requesting an alibi jury instruction.  In that case, the victim testified that, at approximately 12 a.m., in Annapolis, a masked man attacked her; afterward, he forced her to drive to a remote location in Anne Arundel County, raped her, and then fled on foot.  See id. at 245, 472 A.2d at 1044-45.  The evidence showed that the abduction occurred near the petitioner's workplace, and that the rape occurred near his home.  See id. at 245-46, 472 A.2d at 1045.  After law enforcement officers made multiple unsuccessful attempts for the victim to identify the rapist, she identified the petitioner in a lineup after the men therein took off their shirts; although the victim did not see the rapist's face on the night of the crime, she identified the petitioner by his body.  See id. at 245-46, 472 A.2d at 1045.

The petitioner testified that, on the night of the rape, at 9 p.m., he left his workplace. See id. at 246, 472 A.2d at 1045.  According to the petitioner, afterward, he went home, borrowed a vehicle from someone, and drove to Baltimore City, where he visited his girlfriend of several months, who was a prostitute who worked on Baltimore Street.  See id. at 246, 472 A.2d at 1045.  The petitioner, however, did not know his girlfriend's last name or address, and law enforcement officers were unable to locate her.  See id. at 246, 472 A.2d at 1045.  Officers interviewed the person who had allegedly loaned a vehicle to

- 23 -

the petitioner, and that person did not say anything that was relevant to the case.  See id. at 246, 472 A.2d at 1045.  No evidence corroborated the petitioner's alibi testimony.  See id. at 246-47, 472 A.2d at 1045.

After being convicted and pursuing an unsuccessful direct appeal, the petitioner petitioned for postconviction relief.  See id. at 244, 472 A.2d at 1044.  A trial court ordered a new trial on the ground that the petitioner's trial counsel was ineffective in not requesting an alibi jury instruction.  See id. at 244-45, 472 A.2d at 1044.  The State applied for leave to appeal.  See id. at 245, 472 A.2d at 1044.

The Court of Special Appeals granted the application and vacated the trial court's order for a new trial.  See id. at 248, 472 A.2d at 1046.  The Court of Special Appeals determined that, as a matter of trial strategy, it was reasonable for the petitioner's trial counsel not to pursue the alibi, and instead exclusively focus on the victim's identification of the petitioner by his body.  See id. at 247-48, 472 A.2d at 1046.  The Court of Special Appeals pointed out that the person who had allegedly loaned a vehicle to the petitioner essentially denied doing so, and that the petitioner's "scanty knowledge of his 'girlfriend' must have raised a doubt as to whether she existed."  Id. at 247, 472 A.2d at 1045-46.  The Court of Special Appeals explained that it was "possible that[,] rather than helping the defense, the very questionable alibi [] may have actually weakened the [petitioner]'s case."  Id. at 248, 472 A.2d at 1046.  The Court of Special Appeals noted that, by exclusively focusing on the victim's identification of the petitioner by his body, the petitioner's trial counsel "may have succeeded in diverting the jury from thinking about how weak the alibi [] was."  Id. at 247-48, 472 A.2d at 1046.

In Schmitt v. State, 140 Md. App. 1, 37, 779 A.2d 1004, 1024, cert. denied, 367 Md. 88, 785 A.2d 1291 (2001), the Court of Special Appeals held that a petitioner's trial counsel did not provide ineffective assistance of counsel by not requesting an alibi jury instruction. In that case, the State's evidence showed that, between 1:45 a.m. and 2 a.m., the victim was fatally shot across the street from a motel. See id. at 32, 779 A.2d at 1022. A purported alibi witness testified that, between 1:30 a.m. and 2 a.m., he and the petitioner checked into the motel; the witness went into their motel room's bathroom and closed the door; while he was in the bathroom, he heard gunshots; and, when he came out of the bathroom, the petitioner was in their motel room. See id. at 32-33, 779 A.2d at 1022. The witness, however, did not specify how much time had passed between him hearing the gunshots and him coming out of the bathroom. See id. at 33, 779 A.2d at 1022.

After being convicted and pursuing an unsuccessful direct appeal, the petitioner petitioned for postconviction relief. See id. at 6-7, 779 A.2d at 1006. A trial court granted the petitioner's request for a belated appeal as to certain issues but denied his request for a new trial on the ground of ineffective assistance of counsel. See id. at 6, 779 A.2d at 1006-07. The petitioner noted the belated appeal, and separately appealed from the trial court's denial of his request for a new trial. See id. at 6-7, 779 A.2d at 1007.

In both appeals, the Court of Special Appeals affirmed. See id. at 6, 48, 779 A.2d at 1007, 1031. In the appeal that pertained to ineffective assistance of counsel, writing for the Court of Special Appeals, the Honorable Charles E. Moylan, Jr. addressed the performance prong as follows: "Was an alibi defense generated in this case? It is a close call, but technically it may have been. It was not, however, so unmistakably identifiable

as an alibi defense from way down the glen as to brand the failure to recognize it as a mark of lawyerly incompetence." Id. at 33, 779 A.2d at 1022. Judge Moylan pointed out that the petitioner's trial counsel testified that he did not request an alibi jury instruction because it would have simply directed the jury "to consider and apply the evidence along with any other evidence in the case. To me that tells the jurors absolutely nothing." Id. at 34, 779 A.2d at 1023 (internal quotation marks omitted). Judge Moylan emphasized the need to defer to the petitioner's trial counsel's strategic choice, explaining:

> The entitlement to an instruction if you want one does not imply that you are derelict for not wanting one. By analogy, a defendant is constitutionally entitled to an instruction that his failure to take the stand will not be held against him. It is perfectly sound trial strategy, however, to wish to forego such an instruction so as not to draw the jury's attention to the inevitably suspicious failure to take the stand. In this case, counsel may not have wanted to raise any specter possibly suggested by the word "alibi."
> Alternatively, he may not have wanted to clutter the minds of the jurors with a lot of legal gobbledygook that he deemed meaningless. Some attorneys, of course, like the scattershot approach: spray the jury with every bit of verbal grapeshot you have in your arsenal. Other equally good attorneys prefer to keep the attack simple and to hammer at one or two of the enemy's perceived weak points. It is quintessentially a matter of strategic choice. It is George B. McClellan versus Ulysses S. Grant and who will presume to post-mortem the battle?
> Counsel had available to him *Pulley v. State* and *Smith v. State* but he chose not to use them. They are, of course, opinions worthy of precedential respect. In terms of what they accomplish in a courtroom, however, they are not necessarily five-star decisions that inspire trial advocates to snap to attention and salute. Counsel did not think they would help him. Who are judges to second-guess such an on-the-spot assessment by a combatant on the field?

Schmitt, 140 Md. App. at 34-35, 779 A.2d at 1023 (cleaned up). Judge Moylan addressed the prejudice prong as follows: "Having found no deficiency in the performance component, it follows that there can be no prejudice flowing from a deficient performance."

Id. at 37, 779 A.2d at 1024.

## Analysis

Here, we conclude that Mann has failed to satisfy the burden to prove that there is a reasonable probability, or a substantial or significant possibility, that the jury would have acquitted him if his trial counsel had requested, and the circuit court had given, an alibi jury instruction. The circumstance that Mann's trial counsel did not request an alibi jury instruction did not prejudice Mann because none of the four purported alibi witnesses' testimony led to the conclusion that Mann could not have been at the murder scene when Whetstone shot Prince. Additionally, the trial court twice instructed the jury that the burden of proving the defendant guilty beyond a reasonable doubt remains on the State throughout the trial, thereby undermining Mann's claim of prejudice with respect to trial counsel's failure to request an alibi jury instruction.[9]

The question of whether prejudice resulted from Mann's trial counsel's failure to request an alibi instruction involves a fact-specific analysis. In this case, Mann premised his alibi on the testimony of four witnesses— Johnson, Jenkins, Peay, and Ms. Harper— who purported to account for his whereabouts from 7:30 p.m. or 7:45 p.m. through the

---

[9]As the Supreme Court explained in Strickland, 466 U.S. at 697, "a court need not determine whether counsel's performance was deficient before examining the prejudice [that was] suffered by the [petitioner] as a result of the alleged deficiencies." Consistently, in each of multiple cases, this Court concluded that a petitioner had failed to prove prejudice, and thus did not address the performance prong. See Newton, 455 Md. at 366, 168 A.3d at 15; Gross v. State, 371 Md. 334, 355, 809 A.2d 627, 639 (2002); Yoswick v. State, 347 Md. 228, 246, 700 A.2d 251, 259 (1997). We do the same here because the State did not include a question presented as to the performance prong in the petition for a writ of *certiorari*, and because, in its brief, the State indicates that it "does not challenge the [performance] prong before" us.

night of April 22, 2003.  Even if the purported alibi witnesses' testimony was deemed to be credible and the circuit court had given an alibi jury instruction, that would have done nothing to rebut the circumstance that Mann's whereabouts from approximately 6:45 p.m. or 7 p.m. on the evening of April 22—the time that he left McDonald's with Whetstone and Prince—to 7:30 p.m. or 7:45 p.m.—the time that he allegedly arrived at Johnson's house—was unaccounted for.  Similarly, Mann's whereabouts from 8:45 p.m.—the time that Johnson left Mann at Mann's mother's house—to 9:30 p.m.—the time that Jenkins picked him up from his mother's house—was unknown.  In other words, even if the circuit court had given an alibi jury instruction and the jury had believed the purported alibi witnesses, the jury could still have believed that Mann had the opportunity to participate in the kidnapping and killing of Prince, and found Mann guilty.

In evaluating whether Mann was prejudiced by the omission of the alibi instruction, we must consider the totality of the evidence before the jury.  See Strickland, 466 U.S. at 695.  The giving of an alibi jury instruction would not have contradicted the evidence that Mann had a heated exchange with Prince at the McDonald's restaurant about Prince having been a "snitch" and left the premises before 7 p.m.[10] together with Prince and Whetstone, the person who was responsible for shooting Prince, and was not seen again until 7:30 p.m. or 7:45 p.m. that evening, or that Mann's whereabouts between 8:45 p.m. and 9:30 p.m.

---

[10]Davis, Prince's mother, testified that, at approximately 6:45 p.m., he telephoned her and said that he had encountered Mann, and that someone had stolen her Corolla, which Prince had borrowed.  Davis testified that she telephoned 911 and reported the Corolla's theft.  Officer Gardner testified that, at 7:03 p.m., he heard about the report of the Corolla's theft.

were unknown. Nor would an alibi jury instruction have undercut Mr. Harper's written statement that Mann told him he was present when Whetstone shot Prince. Nor would an alibi jury instruction have changed the medical examiner's testimony that the time of death was during the evening of April 22, 2003, and that that was only an approximation as to the time of death because there were too many factors to identify the exact hour. In sum, the purported alibi witnesses' testimony did little to harm the State's case and the failure to give an alibi jury instruction was not prejudicial.

Notably, the evidence includes inconsistent accounts of what Mann did immediately after Fleet stole the Corolla. Detective D'Angelo testified that Mann said that he told Prince that he would get the Corolla back for him, and that he and Whetstone went to Mann's father's house, and then returned to the McDonald's. But, Detective D'Angelo also testified that, in his written statement, Mann wrote that he told Prince that all he knew was that "Kane" was the name of the person who had gotten into the Corolla and driven away, and that Mann and Whetstone went to Mann's father's house, and then to Johnson's house.[11] And, Mr. Harper wrote that Mann said that Whetstone told Prince that he would take Prince to the Corolla. According to Mr. Harper, Mann said that he, Whetstone, and Prince got into the Caprice, which Whetstone drove away; and, at some later point,

---

[11]It is worth observing that no evidence corroborated the two inconsistent statements that Mann provided to Detective D'Angelo, given that neither Mann, his father, nor Whetstone testified. And, unlike the defendant in Smith, 302 Md. at 177, 486 A.2d at 196, who testified that he was in another state when the crime occurred, Mann gave no testimony at all at trial, and his handwritten statement and Detective D'Angelo's testimony concerning his statements were not offered for the purpose of establishing an alibi for Mann, but rather were offered by the State to demonstrate that Mann had been untruthful.

Whetstone shot Prince.

But most importantly, none of the purported alibi witnesses, including Johnson, provided an alibi—*i.e.*, none of them showed "the physical impossibility of [Mann]'s guilt by placing [him] in a location other than the [murder] scene [] at the relevant time." *Alibi*, Black's Law Dictionary. Simply put, the jury could have found all of the purported alibi witnesses credible, and still found Mann guilty. Given this circumstance, the absence of an alibi jury instruction did not prejudice Mann.

This case is on all fours with Syed, 463 Md. at 104-05, 92, 204 A.3d at 165, 157, in which this Court held that a petitioner was not prejudiced by his trial counsel not investigating an alibi witness; this Court explained that the alibi witness's testimony could not have led to an acquittal because it would not have negated the petitioner's guilt, given that the alibi witness did not account for the petitioner's whereabouts for the entire time frame in which he had the opportunity to murder the victim. Similarly, here, none of the purported alibi witnesses accounted for Mann's whereabouts immediately after Fleet stole the Corolla, but before Mann allegedly arrived at Johnson's house in the evening; and, in the interim, Mann had the opportunity to go with Whetstone and Prince, and be present when Whetstone shot Prince. And, none of the purported alibi witnesses accounted for Mann's whereabouts between 8:45 p.m. and 9:30 pm. on the evening of the murder. Just as there was no prejudice in Syed, there was no prejudice here.

Our conclusion is also supported by Matthews, 58 Md. App. at 248, 472 A.2d at 1046, and Schmitt, 140 Md. App. at 37, 779 A.2d at 1024, in each of which the Court of Special Appeals held that a petitioner's trial counsel did not render ineffective assistance

of counsel by not requesting an alibi jury instruction. In each case, there was purported evidence of an alibi, and, accordingly, the petitioner was arguably entitled to an alibi jury instruction on request. See Matthews, 58 Md. App. at 246-47, 472 A.2d at 1045; Schmitt, 140 Md. App. at 33, 779 A.2d at 1022. But, as Judge Moylan aptly explained, "[t]he entitlement to an instruction if you want one does not imply that you are derelict for not wanting one." Schmitt, 140 Md. App. at 34, 779 A.2d at 1023. In each case, the Court of Special Appeals determined that an alibi jury instruction had the potential to be ineffectual, or even prejudicial. See Matthews, 58 Md. App. at 247-48, 472 A.2d at 1046; Schmitt, 140 Md. App. at 35, 779 A.2d at 1023. Similarly, here, an alibi jury instruction would have been of little effect, given that none of the four purported alibi witnesses' testimony precluded guilt.

We are aware that during closing arguments Mann's trial counsel proceeded on the assumption that Whetstone would not have taken the beltway to reach the area behind Fantasies and thus there was not enough time for Mann to be present at the murder and return to Johnson's house by 7:30 p.m. or 7:45 p.m. Detective Laslett testified that Mr. Harper told him that the Caprice's hood was defective, and would pop up when it reached highway speed. During closing argument, Mann's trial counsel pointed out that Mr. Harper had told the detective that the Caprice could not go on the highway. Mann's trial counsel argued that, if one does not drive on the beltway, the trip from the McDonald's to Fantasies takes approximately an hour to an hour-and-a-half, and contended that Mann would not have had time to go with Whetstone and Prince to the area behind Fantasies, and then arrive at Johnson's house by approximately 7:30 p.m. or 7:45 p.m. In any event, the jury was not

bound to proceed on the assumption that Whetstone would not have taken the beltway to reach the area behind Fantasies. Indeed, the only evidence that Whetstone would not have taken the beltway was Detective Laslett's testimony that Mr. Harper told him that the Caprice's hood would pop up when it reached highway speed. Mr. Harper's statement did not establish that it was impossible for Whetstone to take the Caprice onto the beltway or that Whetstone did not take the Caprice on the beltway.

Tellingly, the record demonstrates that Mann's trial counsel pursued defenses other than an alibi defense at trial. During Mann's closing argument, among other things, his trial counsel pointed out that there was no forensic evidence, such as DNA, that linked Mann to Prince's murder. Mann's trial counsel also raised the possibility that Prince had been murdered in a robbery gone wrong, given that, when his body was found, he had no cash on him, he did not have the paycheck that he had told his mother that he was going to get that day, and he was not wearing anything from the waist up. Alternatively, Mann's trial counsel suggested that Mr. Harper had murdered Prince, given that Mr. Harper knew "Curtis Bay like the back of his hand," that officers arrested Mr. Harper after encountering him while he was driving the Caprice, and that one of Mr. Harper's statements to the officers was "suspicious." Finally, in addition to Mr. Harper, Mann's trial counsel indicated that other individuals could have murdered Prince, stating:

> How about . . . the names that are affiliated with [Sharp]'s group, as the prosecutor said? . . . How about [Sharp's brother] wanting to kill [] Prince because [] Prince supplied the gun that was used to kill [Sharp]? Or Chase Williams who was going to have his head busted open by [] Prince and [] Bazemore and others? Or Kurt Hamlet or Tavon Labertto? How about these people wanting to get [] Prince? Madam Prosecutor, just as plausible a motive as the one you suggest to this jury.

That Mann's trial counsel pursued additional defenses undermines the impact of his not requesting an alibi jury instruction.

Finally, the circumstance that the circuit court instructed the jury on the burden of proof twice—once preliminarily at the start of the trial, and once at the conclusion of the trial—undermines Mann's claim of having satisfied his burden to prove prejudice under Strickland. To be sure, jury instructions regarding the burden of proof and similar matters "are not deemed to 'fairly cover' the matter of alibi." Smith, 302 Md. at 180, 486 A.2d at 198 (quoting Pulley, 38 Md. App. at 690-91, 382 A.2d at 626). That said, in a direct appeal, a trial court's alleged error is reversible unless the State proves that it is harmless beyond a reasonable doubt; by contrast, in a postconviction proceeding involving a claim of ineffective assistance of trial counsel, the petitioner has the burden of proving that there is a reasonable probability, or a substantial or significant possibility, that the petitioner's trial counsel's alleged error would have resulted in an acquittal. Even were we to determine that an error occurred that would have required automatic reversal on direct appeal, that does not release Mann from the requirement to prove prejudice when raising an ineffective assistance of counsel claim. See Weaver v. Massachusetts, 137 S. Ct. 1899, 1912 (2017); Newton, 455 Md. at 356-57, 168 A.3d at 9-10. Here, the jury instructions regarding the State's burden of proof militate in favor of a determination that there was no reasonable probability, or substantial or significant possibility, that the omission of an alibi jury instruction, containing essentially the same information, affected the outcome of the trial.

For all of the above reasons, Mann has failed to satisfy the burden to prove that there

is a reasonable probability, or a substantial or significant possibility, that the jury would

have acquitted him if his trial counsel had requested an alibi jury instruction.  Mann's trial

counsel did not render ineffective assistance of counsel by not requesting an alibi jury

instruction.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED.  CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND WITH INSTRUCTION TO DENY THE SUPPLEMENTAL PETITION FOR POSTCONVICTION RELIEF.  RESPONDENT TO PAY COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**

Circuit Court for Baltimore City
Case Nos. 104002009 to 104002014
Argued: October 31, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 29

September Term, 2019

_____

STATE OF MARYLAND

v.

CHRISTOPHER MANN

_____

Barbera, C.J.,
McDonald,
Watts,
Hotten,
Booth,
Harrell, Glenn T., Jr. (Senior Judge,
Specially Assigned),
Greene, Clayton, Jr. (Senior Judge,
Specially Assigned),

JJ.

_____

Dissenting Opinion by Hotten, J., which
Barbera, C.J., joins

_____

Filed:  December 19, 2019

Respectfully, I dissent. The failure to request an alibi instruction, in light of the testimony from four possible alibi witnesses, constituted deficient performance under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984), in the absence or acknowledgement on the record that the failure was rooted in trial strategy. I am persuaded that the deficiency was prejudicial against Mr. Mann and his defense. Additionally, I am persuaded that a general jury instruction regarding the burden of proof in a criminal case is insufficient to ensure the jury does not improperly place the burden on the defense to prove its alibi when an alibi defense is presented.

### *Trial Counsel's Failure to Request an Alibi Instruction was Deficient and Prejudicial*

In *Strickland*, the United States Supreme Court outlined a two-prong test for determining whether a criminal defendant received ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution. 466 U.S. at 687, 104 S.Ct. at 2064. The defendant must initially demonstrate that trial counsel's performance was deficient. *Id.* If established, the defendant must then demonstrate that the deficiency resulted in prejudice to the defendant. *Id.* Under the prejudice prong of *Strickland*, a reviewing court must ascertain whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *Id.* This Court has further interpreted the "reasonable probability" standard to mean that there existed "a substantial or significant possibility that the verdict of the trier of fact would have been affected." *Bowers v. State*, 320 Md. 416, 426, 578 A.2d 734, 739 (1990). While the *Strickland* standard for proving

prejudice is high, and decidedly deferential to trial counsel's performance, it clearly requires the showing of merely "a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068.

I agree with the majority that we do not have to dissect the deficiency prong in the instant case. However, I am not persuaded that Mr. Mann was not prejudiced by trial counsel's failure to request an alibi jury instruction. I agree with the Court of Special Appeals that "the record here is devoid of any strategic reason for not requesting an alibi instruction." *State v. Mann*, 240 Md. App. 592, 601, 207 A.3d 653, 658 (2019). In reaching the conclusion that there was a Sixth Amendment violation, the Court of Special Appeals stated

> there exists a strong concern that a jury will assume that a criminal defendant bears some burden of proof by introducing alibi evidence, even if the word "alibi" is never uttered in the courtroom. . . . By providing an alibi [jury] instruction, [a] trial court sufficiently relieves these concerns. Here, where an alibi [jury] instruction was not given because trial counsel [did not] request it, there is a 'substantial or significant possibility that the verdict . . . [was] affected.'"

*Id*. at 605–06, 207 A.3d at 661 (internal citations omitted). At trial, the State was unable to pinpoint the time of Mr. Prince's death. The defense presented four alibi witnesses that were able to account for some of Mr. Mann's whereabouts on the evening in question. Guided by an alibi instruction, and weighing the credibility of the witnesses and the evidence presented, a jury could have determined that Mr. Prince was killed during the times accounted for by the alibi witnesses. Because the jury did not receive the alibi instruction and at least one juror could have incorrectly shifted the burden to the defense

2

to prove said alibi, there exists a reasonable probability that the verdict would have been affected. As such, Mr. Mann was prejudiced by his trial counsel's failure to request an alibi jury instruction.

***An Alibi Jury Instruction is not Fairly Covered by a Court's General Jury Instructions***

Regarding the assertion that providing the reasonable doubt instruction covers the matter of alibi, I disagree. You should not conflate an alibi instruction with an independent instruction addressing the burden of proof such as the reasonable doubt instruction.

> [W]hen the evidence in a criminal case generates the issue of alibi, and when the defendant requests an instruction specifically addressed to the matter of alibi, the defendant is entitled to a specific alibi instruction, and that the trial court's general instructions concerning the prosecution's burden of proof, etc., are not deemed to "fairly cover" the matter of alibi.

*Smith v. State*, 302 Md. 175, 180, 486 A.2d 196, 198 (1985); *see also Pulley v. State*, 38 Md. App. 682, 382 A.2d 621 (1978). Although the defense offers an alibi to "prove that it was impossible or highly improbable that the defendant was at the scene of the crime when it was alleged to have occurred[,]" the State still bears the burden of proof beyond a reasonable doubt that the defendant was actually at the scene of the crime when it occurred and that the defendant committed the crime. *State v. Syed*, 463 Md. 60, 77, 204 A.3d 139, 148 (2019). In other words, the State must disprove the defense's assertion of an alibi beyond a reasonable doubt.

Ultimately, the purpose of an alibi jury instruction is to avoid confusing the jury and prevent the jury from shifting the burden of persuasion in a criminal case. Regardless of whether the jury received information from other general instructions, the jury must

consider a separate alibi instruction if the circumstances warrant the instruction. Receiving this instruction clarifies the burden of proof when the defense presents alibi evidence. In this case, the absence of an alibi instruction prejudiced Mr. Mann because there is a reasonable probability that the jurors incorrectly placed the burden of persuasion on the defense rather than the State, which could have affected the verdict.

## CONCLUSION

For these reasons, I dissent and would affirm the judgment of the Court of Special Appeals.

Chief Judge Barbera has authorized me to state that she joins in this opinion.